IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

JOSE JULIO DURAN ABREGO,

    Plaintiff,

v.                                                              Case No. 2:23-cv-02515-MSN-cgc
                                                            JURY DEMAND

ESMERALDA ELIZABETH ESCOBAR
GUERRA,

    Defendant.

**ORDER GRANTING PETITION FOR RETURN OF THE CHILD**

Before the Court is Plaintiff Jose Julio Duran Abrego's ("Plaintiff") Verified Petition for Return of the Child to El Salvador Pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ["Hague Convention"] and the International Child Abduction Remedies Act (["ICARA"], 22 U.S.C. § 9001, et seq.). ("Petition," ECF No. 1.) Defendant filed an untimely Answer to Plaintiff's Petition. (ECF No. 37.)[1] Upon consideration of the Petition, arguments and evidence offered at trial, and Plaintiff's[2] closing brief, the Petition is **GRANTED.**

---

[1] Plaintiff moved for default judgment on the Petition given Plaintiff's failure to timely respond to it and, later, to strike the exhibits attached to the Answer under Fed. R. Civ. P. 12(f). (ECF Nos. 36 & 38.) At trial, Plaintiff also moved to strike paragraph 13 of the Answer (pertaining to J.J.D.E.'s current immigration case) because the referenced Exhibit was not attached. The Court took Plaintiff's objection under advisement. Because Defendant did not object to Plaintiff's motion to strike Paragraph 13, the Court hereby grants Plaintiff's request and will not consider that paragraph. On May 14, 2024, the Court denied the request for default judgment and granted the request to strike the exhibits. (ECF No. 49.) The Court will therefore consider the Petition on its merits and without reference to the aforementioned exhibits or paragraph 13 of the Answer.

[2] At the end of trial, parties were directed to submit a supplemental brief on the relevant custodial laws in El Salvador and granted leave to file a closing brief and response to opposing

## BACKGROUND

This matter arises under the Hague Convention and ICARA. The Hague Convention is a multilateral international treaty that was adopted by the signatory nations 'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.'" *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001) (quoting Hague Convention, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, 51 Fed. Reg. 10,493, 10,498 (app. B) (March 26, 1986)). The United States and El Salvador—where Plaintiff alleges his child habitually resided prior to his wrongful removal—are signatories to the Convention, meaning children who are wrongfully removed from either must be promptly returned unless a certain exception applies. *See* 22 U.S.C. § 9001(a)(4). ICARA is a federal statute whose purpose was "to establish procedures for the implementation of the [Hague Convention] in the United States." 22 U.S.C. § 9001(b)(1).

On August 16, 2023, Plaintiff filed his Petition alleging that in July 2021, Defendant wrongfully removed their six-year old son J.J.D.E. from his habitual residence of El Salvador to the U.S. (ECF No. 1 at PageID 3.) On September 6, Plaintiff filed a Motion for Temporary Restraining Order (ECF No. 9), which the Court granted on September 12, 2023 ("TRO," ECF No. 10). In the TRO, the Court directed that Plaintiff serve Defendant and set an expedited briefing schedule for Plaintiff's forthcoming Motion for Preliminary Injunction. Plaintiff filed that Motion on September 13, 2023, ("PI Motion," ECF No. 11), and submitted a Certificate of Service, (ECF No. 13), two days later.

---

party's closing brief. Plaintiff filed a closing brief that included discussion of El Salvador law. (ECF No. 47.) Defendant has not filed anything since trial and the time for doing so has passed.

On September 25, 2023, the Court intended to hold an evidentiary hearing on Plaintiff's PI Motion as scheduled in the TRO.  In appearance were Plaintiff (via video), Plaintiff's Counsel, an interpreter hired by Plaintiff's Counsel, and Defendant.  Before parties could present evidence, however, Defendant requested time to retain a lawyer.  Both parties consented to an extension of the TRO until October 18, 2023 to allow Defendant that additional time.

On October 18, 2023, the Court attempted to proceed with the evidentiary hearing on Plaintiff's PI Motion, which the Court announced at the outset was being consolidated with a trial on the merits of Plaintiff's Petition.[3]  Present were Plaintiff (via video), Plaintiff's Counsel, the translator, and Defendant, who was still not represented by counsel.  Defendant advised that she had found an attorney but had not yet retained her, and thus sought a continuance of the evidentiary hearing.  She agreed, however, to the entrance of a preliminary injunction extending the TRO so as to require visitation and J.J.D.E.'s continued presence in the District.  (*See* ECF No. 21 at PageID 52.)  The Court entered an Order granting Plaintiff's PI Motion and set another date for trial.  (*See* ECF Nos. 18 & 21.)  The Court proceeded to reschedule the trial one more time following Defense Counsel's request for additional time to prepare.  (*See* ECF No. 22.)

Over the course of four days, the Court heard opening arguments and testimony from multiple witnesses.  Plaintiff's witnesses were Magdalena Maria Abrego ("Ms. Abrego," Plaintiff's mother), Emerson Ivan Garcia Siguenza (a police investigator in El Salvador), Griselda Esmeralda Diaz Orellana (an employee of Plaintiff's mother), Omar Antonio Miranda Varela (J.J.D.E.'s godfather), and Plaintiff.  Defendant's witnesses were Claudia Yaneth Ventura (Defendant's friend), Alain Perez Tejeda (family friend of Defendant), Luis Rivera (Defendant's

---

[3] The TRO advised parties that it might so consolidate as permitted by Fed. R. Civ. P. 65(a)(2). (*See* ECF No. 10 at PageID 31.)

brother-in-law), Charles Ray Meredith (Defendant's husband), Carla Vanessa Escobar De-Rivera (Defendant's sister and J.J.D.E.'s godmother), and Defendant. At the close of evidence, the Court set deadlines for parties to file certain supplemental memoranda, including their closing briefs and responses to opposing party's closing brief. (*See* ECF No. 44.)

At trial, parties described their lives prior to J.J.D.E.'s removal very differently. Plaintiff claimed that, while he and Defendant never married, they lived together with J.J.D.E. as a family, doing typical family things like celebrating birthdays, taking vacations, and spending time with extended family. That is, until Defendant absconded with J.J.D.E. and crossed illegally into the U.S. through the assistance of a coyote. He further asserted that he was involved in J.J.D.E.'s life, acted as a father to him, and financially supported him during this time. Defendant, in contrast, claimed that Plaintiff was a jealous and psychologically abusive alcoholic who threatened to take J.J.D.E. from Defendant if she ever tried to leave him. And due to certain connections Plaintiff's mother has in the El Salvador government, Defendant says she believed that Plaintiff could carry out such a threat. She disagreed that Plaintiff was active in J.J.D.E.'s life and financially supported him, claiming instead that Plaintiff spent several nights a week at bars and would come home late and drunk. The witnesses' testimony tracked closely with that of the party to whom the witness was most closely associated.[4] Plaintiff denied all of Defendant's accusations.

---

[4] It appeared to the Court at trial that all of the witnesses—perhaps with the exceptions of Mr. Tejeda and Mr. Siguenza—had taken definite sides in this dispute. While that is not unusual when the witnesses consist of family members or close friends of a particular party, it tends to compromise the credibility of the witness testimony. It certainly did so in this matter, and the Court thus does not rely heavily on the testimony of parties' family members (to include Mr. Varela) or Ms. Orellana, who is an employee of Plaintiff's mother and testified that she was often not present at the house at the same time as Plaintiff. That being said, the Court found some portions of these witnesses' testimony credible and references some of those portions in this Order.

Parties were in close agreement about the circumstances surrounding Defendant's removal of J.J.D.E, however.  After getting into a disagreement with Plaintiff, Defendant left the home she was sharing with Plaintiff and J.J.D.E. and spent approximately three days at her mother's house before leaving for the U.S. sometime between July 22 and July 24, 2021.[5]  Defendant acknowledged that she left with J.J.D.E. in July 2021 and that she did not have Plaintiff's permission to take J.J.D.E.   Everyone also agrees that Defendant and J.J.D.E. ultimately crossed the border illegally through the use of a coyote.  Before reaching the U.S.,[6] Defendant called Plaintiff from Guatemala and told him that he would lose J.J.D.E. if he filed a lawsuit against her.  The Court heard a recording of that phone call at trial.

Plaintiff claims that he then took several legal actions in El Salvador in an attempt to find J.J.D.E.  He says he initially contacted police on July 26, 2021 to report the removal and sought legal assistance from lawyers who told him he needed an address for J.J.D.E. before he could proceed.  So on August 14, 2021, he left El Salvador for the U.S. to find his son.  Along the way,

---

[5] The testimony about the timing of events leaving up to Defendant's departure from El Salvador are murky.  Defendant testified that she and Plaintiff got into a fight that turned physical on May 11, 2021 and that she decided to leave Plaintiff after that fight.  But she did not state when she left Plaintiff or provide an exact period of time for her stay at her mother's house.  Plaintiff claimed that Defendant stayed with her mother about three days before leaving for the U.S.  He testified that Defendant told him on July 22, 2021 that she was moving out of their home to go live with her mother, and that he responded by telling her she could not take her belongings.  He says Defendant sent a car to retrieve her belongings the following day, at which time he told her they needed to discuss J.J.D.E.'s future.  According to Plaintiff, Defendant agreed to meet the next day—July 24—to have that discussion.  When he arrived at Defendant's mother's house, neither Defendant nor J.J.D.E. were there.  Indeed, Plaintiff says Defendant's sister told him at that time that Defendant had contacted a smuggler and had left with J.J.D.E. to travel to the U.S.  Mr. Tejeda also testified that he heard Defendant tell his wife that Plaintiff got physical with her one day and that she had stayed with her mother for about three days before coming to the United States.  Based on this testimony, the Court finds that Defendant stayed with her mother for three days before leaving with J.J.D.E.

[6] The Court does not know the precise date of the phone call but understands that it occurred in late July 2022.

5

law enforcement in El Salvador called him and he was able to file a complaint on August 17, 2021. According to Plaintiff, authorities at the U.S.-Mexico border detained him on his first attempt to cross into the U.S. and returned him to Mexico, which sent him to Guatemala. But Plaintiff was then able to re-enter the U.S. by water, presumably undetected in light of the testimony that he was not detained. He arrived on November 28, 2021.

The testimony at trial concerning the actions parties took once in the U.S. aligned closely but revealed a divide in parties' understanding of one another's motives for those actions. Both testified, for example, about text conversations starting on January 3, 2022 in which parties' argued about the situation and went back and forth about money and the address at which J.J.D.E. was living. But most relevant were parties' understandings of Plaintiff's "delay" in filing the Petition. From Plaintiff's view, Defendant did not file his Petition for almost two years after arriving in the U.S. because his goal is to get back at her—not to retrieve J.J.D.E. She finds it telling that Plaintiff only filed the Petition when he discovered Defendant was in a new relationship. According to Plaintiff, he did not file the Petition until August 2023 because he could not get an accurate address for J.J.D.E. from Defendant and because he did not have a lot of money or legal knowledge. He further asserts that he was seeking legal assistance in the U.S. in May and June of 2022 but that he was told there was nothing he could do.

Plaintiff and Defendant also provided testimony about the effects removal (or the lack thereof) would have on their lives and opined about whether J.J.D.E. would be better off in the U.S. or in El Salvador.

## **DISCUSSION**

ICARA sets forth the specific burden of proof pertaining to actions arising under the Hague Convention. 22 U.S.C. § 9003(e). For actions like this one, in which a plaintiff requests the return

of a child, the petitioner must show by a preponderance of the evidence that the child was "wrongfully removed" from the country of his habitual residence. 22 U.S.C. § 9003(e)(1)(A). To make this showing, the plaintiff must establish that he had custodial rights pursuant to the laws of the country of the child's habitual residence, that he was exercising those rights at the time of removal (or would have been but for the removal), and that the removal was in breach of those rights. *Id.*, Hague Convention, art. 3. If the plaintiff establishes a wrongful removal, the child shall be returned unless the defendant can show that an exception to removal applies. *Id.*, arts. 12, 13, 20; 22 U.S.C. § 9003(e)(2).

I. **Wrongful Removal**

The Court finds that Plaintiff has established a prima facie case for J.J.D.E.'s return to El Salvador. First, there can be no question that Defendant removed J.J.D.E. from his habitual residence. Defendant admitted in her Answer to the Petition both that El Salvador was J.J.D.E.'s habitual residence prior to his removal and that she removed J.J.D.E. from El Salvador in July of 2021 without Plaintiff's consent. (ECF No. 37 at PageID 184 & 187 ¶ 22.) She also testified at trial that she removed J.J.D.E. from El Salvador in July 2021 without Plaintiff's consent. If that were not enough, witness testimony at trial corroborated these admissions. For example, Ms. Abrego, Ms. DeRivera, and Mr. Rivera all testified that J.J.D.E. had only lived in El Salvador prior to his arrival in the United States and that he went to school and had friends and family in El Salvador. Ms. Abrego, Mr. Siguenza, Ms. Orellana, and Mr. Varela testified that Plaintiff discovered J.J.D.E. was gone in July 2021.

Second, the evidence preponderates towards a finding that Defendant's removal of J.J.D.E. was in fact "wrongful" under the terms of the Hague Convention and ICARA.[7] For one, Plaintiff has established that he has custodial rights under the laws of El Salvador. He specifically cites to Article 207 of El Salvador's family code, which states that "[t]he exercise of parental authority corresponds to the father and the mother jointly." (ECF No. 47 at PageID 357; Family Code art. 207 (El Salvador).) Meanwhile, Defendant admitted in her Answer and at trial that Plaintiff is J.J.D.E.'s biological father and that, as such, he "has a right of custody of the child within the meaning of Articles 3 and 5 of the [Hague] Convention. (ECF No. 37 at PageID 184 & 187 ¶ 22.) Perhaps as a result of this admission, Defendant presented no evidence to suggest that Plaintiff did not have custodial rights under the laws of El Salvador or take advantage of the Court's leave to file a supplemental brief on this issue. Accordingly, the Court finds Plaintiff has shown that he had custodial rights prior to J.J.D.E.'s removal.

Upon consideration of the entire record in this case and the evidence presented at trial, the Court also finds that Plaintiff has shown that he was exercising his custodial rights prior to J.J.D.E.'s removal. "It is well established that courts 'liberally find "exercise" whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child,' such that a parent 'cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.'" *Flores-Aldape v. Kamash*, 202 F. Supp. 3d 793, 803 (N.D. Ohio 2016) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1065–66 (6th Cir. 1996)).

---

[7] Curiously, Defendant admitted to Plaintiff's allegation that she "wrongfully removed" J.J.D.E. from his habitual residence. (*See* ECF No. 37 at PageID 187 ¶ 22.) But she also denied that Plaintiff had custodial rights in her Answer and presented evidence at trial to support her contention that he was not exercising those rights prior to J.J.D.E.'s removal. (*See* ECF No. 37 at PageID 187 ¶ 23.)

Here, Plaintiff lived in the same residence as J.J.D.E until approximately four days before his removal. And at trial, Defendant (albeit begrudgingly) admitted that Plaintiff was involved in the raising of J.J.D.E., that he drove her and J.J.D.E. to doctor's appointments (though she said he did not go into the examination room with them), that he attended some family gatherings with J.J.D.E., that he went on vacations with Defendant and J.J.D.E., and that he attended at least one birthday party for his son in 2020. To be sure, Defendant claimed in her Answer to the Petition that "[d]uring the time the Defendant was living with her mother the Plaintiff did not exercise visitation with the child." (ECF No. 37 at PageID 185.) But it became clear at trial that Defendant lived with her mother for only about three days before leaving for the United States. (*See* discussion *supra* n.5.) The Court does not find that three days—standing alone—is sufficient to establish that Plaintiff was not exercising his custodial rights as required by the Hague Convention.

Additionally, other witness testimony supported Plaintiff's assertion that he was in fact exercising his custodial rights at the time of J.J.D.E.'s removal. Ms. Abrego testified that she lived next door[8] to Plaintiff, Defendant, and J.J.D.E., and that Plaintiff and J.J.D.E. had a close relationship, with Plaintiff taking J.J.D.E. to doctor's appointments and for trips to get ice cream. As for financial support, Ms. Abrego stated that Plaintiff worked as an Uber driver and in the business he and Defendant shared. Mr. Varela testified that he had known Plaintiff his whole life and that he personally observed Plaintiff and J.J.D.E. riding bikes, playing games, and running. He acknowledged, however, that he only visited Plaintiff and Defendant occasionally. Plaintiff testified that he taught J.J.D.E. how to ride a bike, took him to soccer matches, dressed J.J.D.E. to

---

[8] The testimony about Plaintiff's and Defendant's living arrangement is not a beacon of clarity. The Court understands that testimony to indicate, however, that Plaintiff, J.J.D.E., and Defendant were living on Ms. Abrego's property in a space of their own, but that Plaintiff and Defendant had separate areas within that space.

9

match himself, took him to visit Defendant's family, and spent time with him washing cars and going shopping. He also stated that J.J.D.E. would spend time in the store his parents ran together. Taken together, the Court finds this testimony sufficient to establish by a preponderance of the evidence that Plaintiff was exercising his custodial rights prior to J.J.D.E.'s removal.

## II.     Applicability of Exceptions to Removal Under ICARA

Having determined the Plaintiff has set forth a prima facie case for J.J.D.E.'s return to El Salvador, the Court turns to the defenses to removal raised by Defendant. Specifically, Defendant asserts that J.J.D.E. is now settled in his new environment and that returning J.J.D.E. to El Salvador would put him "in an intolerable situation" because of Plaintiff's use of alcohol. (ECF No. 37 at PageID 186–87.) These exceptions to removal are "narrow" ones. *Friedrich*, 78 F.3d at 1067 (quoting 42 U.S.C. § 11601(a)(4)). In fact, federal courts "should use when appropriate[] the discretion to return a child, despite the existence of a defense, if return would further the aims of the [Hague] Convention." *Id.* (citing *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d. Cir. 1995)).

### A.     Settled in New Environment

This defense invokes Article 12 of the Hague Convention, which provides, in relevant part:

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.
>
> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Hague Convention, art. 12. Thus, if a plaintiff initiates proceedings more than one year after the wrongful removal of a child, removal may be avoided if that child is "settled" in the new environment. Some factors courts have considered in making this determination are the "age of

10

the child, the stability of the child's residence in the new environment, whether the child attends school or day care consistently, whether the child attends church regularly, the stability of the [defendant's] employment, and whether the child has friends and relatives in the new area." *Blanc v. Morgan*, 721 F. Supp. 2d 749, 763 (W.D. Tenn. 2010).  To prevail on this defense, the party resisting removal must make this showing by a preponderance of the evidence.  22 U.S.C. § 9003(e)(2)(B).  The court retains discretion to return the child even if he is "settled" in his new environment, however.  *Lozano v. Alvarez*, 572 U.S. 1, 15 (2014).

Here, the period of time between J.J.D.E.'s removal and Plaintiff's filing of the Petition exceeds one year; J.J.D.E. was removed around July 24, 2021 and the Petition was filed August 16, 2023.  The Court thus considers whether J.J.D.E. is "settled" in his new environment.  In support of this defense, Defendant stated in her Answer that J.J.D.E. "has now been in the U.S. since July 2021 and is going to school and has done quite well."  (ECF No. 37 at PageID 186.)  At trial, she added that J.J.D.E. has two best friends, a lot of other friends at school, and a good relationship with Mr. Meredith.  Mr. Meredith similarly testified that J.J.D.E. has a couple of best friends (the sons of Mr. Tejeda and Ms. Ventura) and several other friends, including Mr. Meredith's son.  He also stated that J.J.D.E.'s English skills have been improving and that, while he is still learning how to speak Spanish, he and Defendant do not argue or fight.  Ms. Ventura and Mr. Tejeda corroborated the fact that J.J.D.E. is friends with their children and testified in addition that J.J.D.E.'s environment appears stable.

While these facts—which Plaintiff did not challenge—weigh in support of a finding that J.J.D.E. is now settled in the United States, they are not quite enough to counteract the factors that

support J.J.D.E.'s return to El Salvador.  Indeed, J.J.D.E. has spent over half of his life[9] in El Salvador and, with the exception of a maternal uncle in Memphis who returns to El Salvador to visit his wife, all of J.J.D.E.'s paternal and maternal family members live in El Salvador.  There was testimony at trial indicating that J.J.D.E. loves to go swimming and ride bikes with his friends.  But these are activities he can also do in El Salvador, and in fact did do prior to his removal to the U.S.  The testimony at trial also established that he attended school, did well in school, and played with his friends before coming to the U.S.

In addition, the Court finds that there are additional considerations that counsel against permitting Defendant to avail herself of this defense.  First, Plaintiff has established that, while he did not file his Petition within a year of J.J.D.E.'s removal, he has taken measures to retrieve J.J.D.E. since July 2021, including by filing a report with law enforcement in El Salvador, leaving a statement with border authorities in the U.S. concerning his search for J.J.D.E., and seeking legal assistance in both El Salvador and the United States.  Second, the testimony at trial established that Plaintiff did not believe he could initiate legal proceedings until he discovered J.J.D.E.'s whereabouts, and that he did not know until October 13, 2022 at the earliest that Defendant and J.J.D.E. were living in Memphis, Tennessee.  Notably, Plaintiff filed his Petition in the Western District of Tennessee within a year of that date, and after discovering that J.J.D.E. was actually living at a different address in Memphis.  Third, the Court remains cognizant of the fact that "the Hague Convention is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich*, 78 F.3d at 1064 (quoting

---

[9] The Court does not know how old J.J.D.E. is as of the date of this Order.  But even if he has turned seven, he has only been in the United States since August 2021 at the earliest, which constitutes fewer than three years.

12

Pub. Notice 957, 51 Fed. Reg. 10494, 10505 (1986)).  Defendant has not carried her burden to establish this defense.

### B. Intolerable Situation

Section 13 of the Hague Convention provides an additional defense to removal if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague Convention, art. 13(b).  Here, Defendant does not argue that returning J.J.D.E. to El Salvador would result in physical or psychological harm, but rather that it poses a "grave risk" of putting J.J.D.E. in an "intolerable situation" because of Plaintiff's "addiction to alcohol and previous inability to provide for his family due to this addiction."  (ECF No. 37 at PageID 187; *See also Pliego v. Hayes*, 843 F.3d 226, 233 (6th Cir. 2016) (stating that an "otherwise intolerable situation" and "physical or psychological harm" are separate inquiries).)  Under ICARA, Defendant must establish this defense by clear and convincing evidence.  22 U.S.C. § 9003(e)(2)(B).

The Court finds that Defendant has not met her burden to establish this defense. The circumstances that qualify as an "intolerable situation" are, like the exception itself, narrow. Sexual abuse is one such set of circumstances, as is the state of habitual residence's inability to adjudicate custody disputes.  *Friedrich*, 78 F.3d at 1068–69 (quoting Public Notice 957, Fed. Reg. 10494, 10510 (March 26, 1986)); *Pliego*, 843 F.3d at 233.  But Defendant alleges neither of these situations.  In fact, the Court is left guessing as to the precise circumstances Plaintiff fears.  To be sure, Defendant most likely means to say that Plaintiff would neglect his son as she says he did while they were living together, spending time out drinking with friends rather than at home with J.J.D.E.  And there may be something to Defendant's concern.  Indeed, the Court did not find credible Plaintiff's, Ms. Abrego's, or Mr. Varela's testimony that Plaintiff has never consumed

13

alcohol and found credible Mr. Rivera's testimony that that he sometimes saw Plaintiff drinking while he was out in the street and that Plaintiff sometimes appeared to be drunk. The Court also did not believe Plaintiff's testimony when presented with a photo[10] of him in which he appears to be intoxicated and in which he is holding a clear, beer bottle-type container that he did not know what was in the bottle and never consumed its contents. But even assuming Plaintiff drinks alcohol and gets drunk, the evidence in the record does not establish by clear and convincing evidence that he also neglected J.J.D.E., or that the neglect to which Defendant alludes arises to the level of an "intolerable situation." Furthermore, Defendant testified at trial that Plaintiff has never harmed J.J.D.E. and there exists no evidence[11] in the record to suggest Plaintiff would harm him now. In fact, it appeared from the credible portions of the witnesses' testimony in this case that J.J.D.E.'s life in El Salvador was generally a good one, surrounded by friends and family who love him, including his father. Furthermore, the Court is mindful of the general principle inherent in ICARA and the Hague Convention that this Court "has jurisdiction to decide the merits of an abduction claim, [] not the merits of the underlying custody dispute." *Friedrich*, 78 F.3d at 1063–64. Should

---

[10] This photo (Exhibit 6) was introduced for identification purposes only. Upon further review, the Court grants Defendant's request to enter this photo into evidence. Plaintiff's objection to the photo was that it bears no time or date stamp. But Defendant offered it to counter Plaintiff's testimony that he never consumed alcohol and Plaintiff identified himself in the photo. The Court thus finds it admissible for the purpose of impeaching Plaintiff's testimony that he never consumed alcohol.

[11] Defendant testified that Plaintiff struck her and threw her to the ground on May 11, 2021 and that J.J.D.E. was present during that fight. But while horrible if true, J.J.D.E.'s presence alone on that one occasion does not establish by clear and convincing evidence either a "grave risk" of return to an "intolerable situation" or "grave risk" of harm as that term has been interpreted. *See Friedrich,* 78 F.3d at 1068 (quoting Public Notice 957, 51 Fed. Reg. 10494, 10510 (March 26, 1986)) ("The person opposing the child's return must show that the risk to the child is grave, not merely serious.").

Plaintiff neglect J.J.D.E., such circumstances are more appropriately suited for adjudication in El Salvador.

Defendant also offered other testimony at trial that the Court understood as additional arguments relating to this issue. First, she testified that she married Mr. Meredith shortly after being served with the Petition in this case and that he is in the process of seeking a change of immigration status for Defendant and J.J.D.E. so they can visit El Salvador. Thus, returning J.J.D.E. now would forfeit that opportunity. But forfeiture of potential legal status in the U.S. has no bearing on whether the Court would be returning J.J.D.E. to an "intolerable situation" when, as here, Defendant has apparently not received asylum status.[12] *See Salame Ajami v. Tescari Solano*, 29 F.4th 763, 776–77 (6th Cir. 2022) (finding that an "intolerable situation" exists when a parent is forced to choose between their asylum status in the U.S. and loss of custody should they fail to return to the country of custodial adjudication). There was also allusion to crime in El Salvador, the general sense that J.J.D.E. would have access to better opportunities in the U.S. than he would in El Salvador, and Plaintiff's unwillingness or inability to provide for his son given his alleged abuse of alcohol. But "return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State" does not fit in to this defense. *Id.* And, as noted, Defendant's allusions to Plaintiff's neglectful behavior do not constitute clear and convincing evidence of severe neglect and are more fitting for adjudication in El Salvador should those concerns bear out. Defendant has not borne her burden to establish this defense.

---

[12] Defendant testified that she cited family violence as the reason she left El Salvador to come to the U.S., presumably upon her arrival at the U.S.-Mexico border. The Court has not found any evidence in the record indicating that Defendant was granted asylum, however. In fact, the only evidence as to Defendant's legal status that has been put into the record is what appear to be screenshots from Defendant's account with the Executive Office for Immigration Review's Automated Case Information System indicating that her case remains pending.

**III.     Attorneys' Fees**

Finally, Plaintiff seeks an award of attorneys' fees and costs. Article 26 of the Hague Convention provides, in relevant part:

> Upon ordering the return of a child or issuing an order concerning rights of access under this Convention, the judicial or administrative authorities may, where appropriate, direct the person who removed or retained the child, or who prevented the exercise of rights of access, to pay necessary expenses incurred by or on behalf of the applicant, including travel expenses, any costs incurred or payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child.

Hague Convention, art. 26. ICARA further states that "[a]ny court ordering the return of the child pursuant to an action brought under [ICARA] shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner." 22 U.S.C. § 9007(b)(3) (2012). ICARA's mandate has been interpreted by other courts to require an award of fees and costs unless the defendant can show the request is unnecessary or clearly inappropriate. *See, e.g.*, *Blancarte v. Santamaria*, No. 19-13189, 2020 U.S. Dist. LEXIS 13589, at *2–3 (E.D. Mich. Jan. 28, 2020) (collecting cases). As the Court has ordered J.J.D.E.'s return, Defendant bears the burden to show the requested award is not necessary or appropriate. *Id.* at 3.

Here, Plaintiff's Counsel filed an affidavit on March 1, 2024 asserting that the services provided and costs incurred amount to $46,866.22—$44,513.74 in fees and $2,372.48 in costs. (ECF No. 46 at PageID 312.) This amount initially strikes the Court as slightly high. But while the affidavits in this matter have provided some rates for the individuals working on this case, the Court is ultimately unable to assess the reasonableness of the requested award because there is not a comprehensive itemization of the fees and costs. Plaintiff is therefore ordered to file an itemized statement of expenses, to include the hours worked and rates charged.

## **CONCLUSION**

For all these reasons, the Court **ORDERS** as follows:

1. Plaintiff's Verified Petition for Return of the Child to El Salvador Pursuant to the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act, (ECF No. 1), is **GRANTED**.

2. Parties are **ORDERED**, through counsel, to reach an agreement regarding the manner of J.J.D.E.'s return to El Salvador.

3. Such return is **ORDERED** to occur within forty-five (45) days of this Order.

4. Plaintiff is **ORDERED** to file an itemized statement in support of his requested award of attorneys' fees and costs within five (5) days of the date of this Order.

5. Defendant is **ORDERED** to either stipulate to the costs and fees proposed by Plaintiff or to provide argument why such costs and fees should not be awarded as unnecessary or inappropriate within five (5) days after Plaintiff's statement has been filed.

**IT IS SO ORDERED**, this 28th day of May, 2024.

*s/ Mark S. Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE